IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KIMBERLY ANN TAYLOR,      §
     §
        Plaintiff,      §
     §
v.      §      Civil Action No. H-12-03296
     §
CAROLYN W. COLVIN      §
ACTING COMMISSIONER, SOCIAL      §
SECURITY ADMINISTRATION,      §
     §
        Defendant.      §

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 9), Plaintiff's Motion for Summary Judgment (Document No. 8), Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No.13), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No.14), and Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 15).[1] Having considered the Parties' submissions, the administrative record, and the applicable law, the court **ORDERS**, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 9) is **GRANTED**, Plaintiff's Motion for Summary Judgment (Document No. 8) is **DENIED**, and the decision of the Commissioner is **AFFIRMED**.

---

[1] On August 1, 2013, pursuant to the parties' consent, the District Judge transferred this case to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 12.

## I. INTRODUCTION

Plaintiff, Kimberly Ann Taylor, (Plaintiff or "Taylor") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405 (g), seeking judicial review of the Commissioner of Social Security administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental social security income ("SSI"). [2] Taylor argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Gary J. Suttles, committed errors of law when he found that Taylor was not disabled. Taylor argues that she has been disabled since August 29, 2007, (Tr. 16), due to bipolar disorder, fibromyalgia, lap band surgery, and chronic pain.

Ms. Taylor argues that the ALJ erred by discounting the opinion of her treating physician. The Commissioner counters that substantial evidence supports the Commissioner's final administrative decision, that the Commissioner followed the correct legal standards in making his findings of fact and conclusions of law, and that the ALJ's decision should therefore be affirmed.

## II. ADMINISTRATIVE PROCEEDINGS

On October 29, 2007, Taylor filed claims for a period of disability and DIB under Title II of the Act, 42 U.S.C. § 423, and for SSI benefits under Title XVI of the Social Security Act, 42 U.S.C. 1382c(a)(3) (Tr. 203-11), claiming she was disabled due to a mental condition. (Tr. 227).

---

[2] At the hearing on May 8, 2009, Plaintiff withdrew her claim for Disability Insurance Benefits under Title II of the Act. (Tr. 34-35). Accordingly, only Plaintiff's claim for SSI benefits is at issue in this matter.

The Commissioner denied Taylor's applications at the initial stage on February 7, 2008, and on reconsideration on April 14, 2008   (Tr. 126-130).   Taylor's attorney, Michael Hengst, subsequently requested a hearing before an ALJ on July 10, 2009 (Tr. 168). The Social Security Administration granted the request and the ALJ held a hearing on May 8, 2009. (Tr. 31-61).  Mr. King attended the hearing as a vocational expert and testified as an impartial expert witness.   On June 1, 2009, the ALJ issued a decision finding that Taylor was not disabled under the Social Security Act.  (Tr. 104-116).

Taylor sought review by the Appeals Council of the ALJ's decision, and on February 5, 2010, the Appeals Council remanded the case to the ALJ to re-evaluate weight given to opinion evidence from Dr. Larry Flowers, Taylor's treating physician, and to reconsider Taylor's RFC.  (Tr. 117-119).  On September 1, 2011, the ALJ held a second hearing, and October 28, 2011, the ALJ issued a decision finding that Taylor was not disabled under the Act.  (Tr. 273).  The Appeals Council denied Taylor's request of review of the ALJ's decision.  (Tr. 1-4).  Taylor timely filed the instant action, requesting this Court to review the Commissioner's final administrative decision.  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 670.  There is no dispute as to the facts contained therein.

## III. STANDARD OF REVIEW

The Court's standard of review is substantial record evidence and the Court's review of the Commissioner's final decision is limited under 42 U.S.C. § 405(g) "to determine (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones*

*v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). While it is incumbent upon the court to examine the record in its entirety in order to decide whether the decision is supportable, the court may not "reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [its] judgment for that of the [Commissioner's] decision." *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979); *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Indeed, "[t]he court does not re-weigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey v. Apfel*, 230 F.3d at 135, citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richard v. Perales*, 305 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla, but it need not be a preponderance." *Anthony v. Sullivan*, 954 F.2d at 295; *see also Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible sources or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. BURDEN OF PROOF

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted for a continuous period of no less than 12 months." 42 U.S.C. § 423 (d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* §432(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *Id.* § 423(d)(2)(A).

The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a plaintiff is disabled only if he is "incapable of engaging in *any* substantial gainful activity." *Anthony*, 954 F.2d at 393 (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step process to determine disability status under 20 C.F.R. § 416.920(a)(4):

> (1) If the claimant is presently working, a finding of "not disabled" must be made;

> (2) If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

> (3) If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

> (4) If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

> (5) If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled. *Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d

558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).

Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1990). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the plaintiff to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner finds that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

In the instant action, the ALJ determined, in his June 1, 2009, decision that Taylor was not disabled because she had the RFC to perform medium work subject to certain restrictions. In particular, the ALJ determined that Taylor had not engaged in substantial gainful activity since August 29, 2007, (step one); that Taylor's affective mood disorder or schizo-affective disorder are severe impairments (step two); and that these impairments, either singly or in combination, did not meet or equal a listed impairment in Appendix 1 of the regulations (step three). The ALJ next determined that Taylor had the residual functional capacity ("RFC") for medium work. The ALJ found that Taylor could lift and carry twenty pounds occasionally and ten pounds frequently with an ability to stand, walk, and sit for 6 hours in a workday, with normal breaks. Taylor was unlimited in her ability to push/pull and her gross/fine dexterity. She could bend, stoop, balance, twist, and squat. The ALJ determined that she could not climb ropes, ladders or scaffolds, or be exposed to dangerous machinery, heights, or uneven surfaces. As for Taylor's mental limitations, the ALJ found that Taylor could understand simple instructions,

concentrate and perform simple tasks, could get along with others, and could adapt to both work-place changes, and to supervision, in a limited public/employee contact setting. At step four, the ALJ found Taylor could not perform her past relevant work. At step five, based on Taylor's RFC, her age, education and the testimony of a vocational expert, the ALJ found that Taylor could perform work as a laundry worker, a hand packager and as a dishwasher and that she was not disabled within the meaning of the Act. As a result, the Court must determine whether substantial evidence supports the ALJ's determinations.

In determining whether the ALJ's decision is supported by substantial evidence, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the claimant and corroborated by family and neighbors; and (4) the claimant's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. DISCUSSION

### A. Medical Facts

The objective medical evidence shows that Taylor received treatment for lumbar spinal stenosis, elevated blood pressure, and weight loss following a gastric banding procedure from her primary care physician, Dr. David T. Le, from May 30, 2002 until February 27, 2008. (Tr. 545-548, 561-563, 588, 608, 624, 627). Taylor also reported that Dr. Le had diagnosed her with fibromyalgia, but there are no medical records to support this diagnosis. (Tr. 572-592). Taylor had voluntary Lap band surgery in 2007.

Taylor has also been diagnosed with and treated for bipolar disorder, anxiety, and self-reported pain. Taylor was seen by Dr. Flowers, between 2000 and most of 2009.  Dr. Flowers prescribed Celexa, Norco, Abilify, Seroquel, Klonopin, and Lithium at various times to control her depression and bipolar disorder.  (Tr. 320-323, 314, 318-319, 404). Despite three hospitalizations and several instances of non-compliance with medication, Dr. Flowers' treatment notes are extremely similar throughout his nearly decade long treatment of Ms. Taylor. On October 23, 2006 and May 7, 2007, Dr. Flowers treated Ms. Taylor for her bi-polar disorder and refilled her medications. (Tr. 314-319). During both office visits, Dr. Flowers noted that Ms. Taylor was stable with clear orientation, speech thought, and judgment. *Id.*

However, on August 11, 2007 Taylor was hospitalized at Cypress Creek Hospital. Taylor reported that she "just became out of control."  (308, 310-317).  Dr. Flowers preformed a psychiatric evaluation on Taylor in the hospital and found the following:

> **CHIEF COMPLAINT**: This is a 42-year old white female with history of bipolar disorder who comes in with the chief complaint, "I just became out of control."
>
> **PAST PSYCHIATRIC HISTORY**: She has been seeing Dr. Flowers for ten years.
>
> **CURRENT MEDICAL HISTORY**: She has a UTI and leg pain. She has fibromyalgia. She reports she sees Dr. Le as a Primary Care Physician.
>
> **SUBSTANCE ABUSE**: Years ago, she used to drink up until her late 20s 6-7 beers, 2-3 times a week going out partying. She reports no significant drug use, but she tried marijuana and cocaine and periodically uses it. She states she can no longer smoke marijuana because it makes her sick. She reports smoking 1 ½ packs of cigarettes a day and states her caffeine intake is normal.
>
> **MENTAL STATUS EXAMINATION**: She is dressed unkempt. She has scars all over her legs. She reports she was bitten by ants. She looks somewhat emaciated. Her activity level is fidgety. Her behavior is

anxious. Her affect is anxious. Her speech is initially loud, but then she calms down. Her thought content is delusional. She has some paranoia and disorganization. Judgment and insight are impaired. She does have auditory hallucinations. Memory reveals [she] can remember one out of three objects in five minutes and remembers President Bush, Clinton, Bush. Concentration reveals [she] can do serial threes and serial sevens and spell "world" forwards and backwards.

**DISCUSSION**: This is a 42-year-old female who has been stable. She recently had some substance use and non-compliance with meds causing her to deteriorate. Patient's prognosis depends on patient's motivation for treatment and willingness to follow the outlined treatment program.

**DIAGNOSIS**:

**AXIS I:** Bipolar disorder, mixed episode with both features of mania and depression exacerbated by fibromyalgia and chronic pain and recent substance abuse.

**AXIS II**: Nil

**AXIS III**: Fibromyalgia, Urinary Tract Infection, Status post bypass, Rule out dehydration and malnutrition.

**AXIS IV**: Dealing with severe mental illness.

**AXIS V**: This past year GAF[3] high of 60[4], and a current GAF of 25[5].

**ASSETS**: She can be sociable

**WEAKNESS**: She has a long history of mental illness and some history of non-compliance. (Tr. 308-309).

Taylor was discharged a few days later on August 20, 2007, as "mentally stable" and had a GAF of 50.[6] (Tr. 316-317).

---

[3] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text rev 2000 (DSM-IV) at 32.
[4] A GAF score of 51-60 reflects Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34.
[5] A GAF score of 21-30 Presence of hallucinations or delusions which influence behavior OR serious impairment in ability to communicate with others OR serious impairment in judgment OR inability to function in almost all areas. DSM-IV at 34.

On September 24, 2007, Taylor was voluntarily admitted to IntraCare Hospital for treatment of bipolar and cocaine abuse.  (Tr. 281, 311-313). When admitted, Taylor stated she was taking Celexa, Lithium, and Xanax but reported, "she had been taking her medications off and on." (Tr. 308). Dr. Flowers visited Taylor in the hospital and described her as, "genetically at risk for depression, but has been noncompliant with medications recently.  She had been stable and under control prior with a past GAF of 58-60 and a current GAF of 20." On October 2, 2007, Dr. Flowers' encouraged Taylor to continue taking her medication and attend 12 step meetings.  (Tr. 306).  Taylor was discharged on October 3, 2007, with a GAF of 50.  (Tr. 307).

On November 19, 2007, Dr. Flowers refilled Taylor's prescriptions. (Tr. 304). The treatment notes show Taylor had intact judgment, was neat and clean, had normal speech, and her insight was intact. (Tr. 305). After this visit Taylor did not see Dr. Flowers in his office again for treatment of bipolar disorder until January 2009.  (Tr. 404).

On January 16, 2008, Dr. Barbra Hall evaluated Taylor and prepared a psychological report.  (Tr. 370). With respect to this report, Dr. Hall wrote:

**GENERAL OBSERVATIONS**
Ms. Taylor was driven to the exam by her mother. She only drives short distances. She was on time to her appointment. Her driver's license was examined. She was casually dressed and well groomed. Her attitude was cooperative.

**INFORMANT**:
She served as her own informant. She is judged to be reliable.

**CHIEF COMPAINT:**

---

[6] A GAF score of 41-50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).
DSM-IV at 34.

"Going out in public I get panicky and freak out. I can't handle it It's gotten worse.

## HISTORY OF PRESENT ILLNESS:

Ms. Taylor worked for ten days last June as a waitress. She left the job due to anxiety. She worked as a waitress for four years ending fourteen years ago, which she enjoyed. Dr. Larry Flowers has been her psychiatrist for eight years. He prescribes Lithium, Celexa, Scroquel, Abilify, and Clonazepam. She said these medications help her. She has not had counseling. She had two psychiatric hospital admissions last year, one at Cypress Creek Hospital and the other at IntraCare North Hospital. She was having hallucinations and became suicidal. She said she has always been "highly nervous and unable to go places." She is being treated for fibromyalgia. She had Lap-Band surgery three years ago.

### Activity of Daily Living
She has lived with her mother for a few months.  Her children are ages 17 and 16 and also live there.  Her house was foreclosed.  She gets along well with her mother who is a nurse.  She can shop for groceries and prepare meals.  Her mother handles the money.  She can read.

### Social Functioning
She was socially awkward with flat affect.  Her mother is emotionally supportive of her.  She does not have any friends or participate in any activities.

## PAST HISTORY:
She grew up in Baytown. Her childhood was happy. She has a younger brother. She graduated from high school. She has been married twice. Her husband left her recently. She denied alcohol and drug problems except that she said she abused drugs as a youth.

## MENTAL ASSESMENT

### Appearance, Behavior and Speech
Behavior was lethargic.  Speech was slow.

### Thought Process
Thinking was abstract and concrete and logical and relevant.

### Thought Content
She has suicidal ideation with no plan and paranoid ideation.  She denied homicidal ideation.

### Perceptual Abnormalities

11

She has auditory hallucinations

Mood and Affect
Mood was anxious and depressed.  Affect was very flat.

Sensorium and Cognition
She was oriented.  Fund of information was limited.  Intelligence appeared
to be average.

Judgment and Insight
Judgment and insight were adequate.

**DIAGNOSES**:
Axis I: Bipolar Disorder
Axis II: No Diagnosis
Axis III: See medical reports
Axis IV: Loss of primary relationship, lack of occupational functioning,
and financial hardship.
Axis V: GAF = 55 (Tr. 370-374).

On January 20, 2008, Dr. Chappius reviewed Ms. Taylor's records and completed

a Psychiatric Review Technique and a Mental Residual Functional Capacity Assesment.

Dr. Chappius evaluated Taylor under listing 12.04 for bi-polar disorder and listing 12.09

for her substance abuse of cocaine. (Tr. 375). Under the "B" Criteria of listings for 12.04,

Dr. Chappius opined that Ms. Taylor had a mild restriction of activities of daily living,

moderate limitation in maintaining social functioning, no difficulties in maintaining

concentration, persistence or pace, and one or two episodes of decompensation, each of

extended duration. (Tr. 385). Dr. Chappius also found there was no evidence to establish

the presence of "C" criteria under 12.04. (Tr.386). Dr. Chappius opined that:

MER indicates long history of psych treatment with two recent short
psych hospitalizations in 8/07 and 9/07 for bi-polar disorder, mixed with
cocaine abuse when some non-compliance with her medications caused
her to decompensate. Psych AP noted she had been stable previous to
these hospitalizations. Well oriented. Unable to remember three objects
after five minutes. Could remember five digits forward and four
backwards. Could name two previous presidents. Spelled WORLD
backwards and could perform all calculations and serial correctly

Judgment/Insight-intact. ADLs: Can shop for groceries and cook, perform some household chores. Social: Appears socially awkward with flat affect. (Tr. 387).

Dr. Chappius also completed a Mental Residual Functional Capacity Assessment. Dr. Chappius found Ms. Taylor to not be significantly limited in her ability to remember locations and work-like procedures, ability to understand and remember very short and simple instruction. Her ability to understand and remember detailed instructions was markedly limited. (Tr. 389). As for concentration and persistence, Dr. Chappius indicated that Ms. Taylor was not significantly limited in the ability to carry out very short and simple instruction, maintain attention and concentration for extended periods of time, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without supervision, and the ability to make simple work related decisions. (Tr. 389). Under social interaction, Dr. Chappius found Ms. Taylor to not be significantly limited in her ability to ask simple questions or ask assistance, to get along with coworkers without distracting them or exhibiting behavioral extremes and the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 390). Dr. Chappius opined that Ms. Taylor was moderately limited in her ability to work in coordination with or proximity to others without being distracted and was markedly limited in her ability to understand, remember, and carry out detailed instructions. (Tr. 389). However, Ms. Taylor was found to be moderately limited in her ability to interact with the general public, work a normal workday and work week without interruptions from psychologically based systems, and the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 390).

Overall, Dr. Chappuis concluded that, " the claimant can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting. (Tr. 391).

Dr. Dolan completed a Physical Residual Functional Capacity Assessment based on Ms. Taylor's medical records on February 4, 2008. Dr. Dolan found that Ms. Taylor could occasionally lift and/or carry a maximum of fifty pounds and frequently lift and/or carry a maximum of twenty-five pounds. Dr. Dolan further found that Taylor could stand, walk, and sit (with normal breaks) for a total of about six hours in an eight hour workday with unlimited ability to push and/or pull. (Tr. 394). Dr. Dolan supported his assessment by concluding that Ms. Taylor was a:

> 43-year-old female with no allegations of physical limitations. Recent MER notes history of gastric lap-band about a year ago with weight loss of eighty pounds. Also notes history of fibromyalgia and chronic leg pain treated with Lortab and Lyrica. 9/07 exam notes normal function of all extremities with good grip strength, normal muscular, skeletal, and neuro-function. Gait normal. The DO noted no significant physical limitations and the claimant reported no problems or treatment sources for physical problems. Physical limitations are not fully supported by the MER. TXVI. Unable to establish credibility due to insufficient evidence prior to DLI. TII. (Tr. 394, 398).

On April 25, 2008, Taylor was admitted to the Emergency Room at Cypress Creek and transferred to St. Joseph Hospital due to suicidal thoughts.  Taylor was hospitalized and treated by Dr. Root who completed the following exam:

> **MENTAL STATUS EXAMINATION**:  The patient is slightly unkempt in her appearance.  Her rate of speech is very slow.  Her affect is depressed.   Thought content: she is not homicidal, delusional, or hallucinating.  Regarding suicide, she said she feels helpless and that overdose has always been an option.  Sensorium is clear.  Judgment and insight into the nature of her problem are poor.  No gross deficits in short

or long-term memory.   Intellectual functioning is average.   Gross psychomotor retardation is present.

**SHORT TERM PLAN**:   Adjust medication.   Get internal medicine consult.

**LONG TERM PLAN**:   Medication maintenance in structured setting. (Tr. 425).

**MEDICATIONS**:   Lithium, Celexa, Abilify, Seroquel, Clonazepam, Lyrica, and Norco.

**DIAGNOSES**:   Major depression and fibromyalgia by history.   (Tr. 429).

Dr. Root opined that adding Haldol to Ms. Taylor's regimen "helped immensely," by silencing the voices and improving her disposition. (Tr. 430.) Taylor was discharged the next day, April 29, 2008 with Celexa, Klonopin, Haldol, Lyrica, and Seroquel with instructions to follow up with Dr. Flowers. *Id.*

On January 26, 2009, Dr. Flowers completed a Mental Residual Functional Capacity ("RFC") Questionnaire. It had been thirteen months since Taylor's last office visit. (Tr. 404-408). Dr. Flowers concluded that Taylor did not have a low IQ or reduced intellectual functioning. (Tr. 407). With respect to Taylor's mental abilities Dr. Flowers found her to be limited but satisfactory in her ability to understand and remember very short and simple instructions. (Tr. 406). Dr. Flowers found Taylor seriously limited, but not precluded in her ability to carry out very short and simple instructions, make simple work-related decisions, and ask simple questions or request assistance. (Tr. 406). Ms. Taylor was found to be unable to meet competitive standards in her ability to:

- Remember work-like procedures
- Maintain attention for two-hour segment
- Maintain regular attendance and be punctual within customary, usually strict tolerances
- Sustain an ordinary routine without special supervision

- Work in coordination with or proximity to others without being unduly distracted complete a normal workday and workweek without interruptions from psychologically based symptoms
- Complete a normal workday and work week without interruptions from psychologically based symptoms
- Perform at a consistent pace without an unreasonable number and length of rest periods
- Accept instructions and respond appropriately to criticism from supervisors
- Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes
- Respond appropriately to changes in routine work setting, and be aware of normal hazards and take appropriate precautions.
- Be aware of normal hazards and take appropriate precautions. (Tr. 278).

Dr. Flowers indicated that Ms. Taylor would have no useful ability to deal with normal work stress and checked fifty of the fifty-six symptoms listed on the questionnaire. (Tr. 405-406). Dr. Flowers found Taylor to be oriented to person, place, time and situation, in addition to intact judgment and insight with clear thought and neat appearance. (Tr. 451). Dr. Flowers refilled Ms. Taylor's usual medications: Haldol, Lithium, Seroquel, Klonazepam, Abilify, and Celexa with no refills. (Tr. 452).

After an eight-month break in treatment, Ms. Taylor was out of her medications and went to see Dr. Flowers on September 25, 2009. (Tr. 449). Dr. Flowers proceeded to refill Ms. Taylor's usual medications: Celexa, Haldol, Lithium, Abilify, and Klonazepam. (Tr. 450). His exam reveals that Ms. Taylor was oriented to person, place, time, and situation, had a neat and clean appearance, with intact judgment and insight. *Id.*

Ms. Taylor returned to Dr. Flowers' office on October 26, 2009. Dr. Flowers' treatment notes, like his prior treatment notes, revealed that Taylor was stable. She was oriented to person, place, and time, had normal speech and intact judgment during her appointment. (Tr. 448).

A medical note from January 17, 2010, indicates that Ms. Taylor was oriented to person, place, time, and situation. (Tr. 448). Dr. Flowers wrote that she has returned to her "earlier stable self," and refilled all of her medications. (Tr. 445-446).

Taylor underwent a psychological evaluation by Dr. Frank Fee on October 6, 2010. (Tr. 409 – 419). He found that Ms. Taylor's "immediate and long term memory was intact," that she was oriented to person, place, time and situation, in addition to having average intelligence with clear and goal directed thought processes. (Tr. 411). Further, Dr. Fee found that Ms. Taylor had a GAF equivalent to 57 and a full scale IQ of 69. (Tr. 415). Dr. Fee wrote:

**GENERAL OBSERVATIONS**
Kimberly arrived on time for her scheduled appointment and was brought in by her mother. She currently possesses a driver's license, and reportedly capable of operating a motor vehicle, but doesn't drive on the freeways. She appeared her stated age, average height, and build. She reported some vision problems, especially when driving at night. No hearing problems were reported or observed. She appeared tired and drowsy during both the interview and testing. She was casually dressed and exhibited adequate personal hygiene and grooming. Her eye contact was sustained and rapport was easily established. Kimberly was not on any psychiatric medications for today's evaluation. Her gait appeared normal limits and she did not appear to have any physical discomfort or obvious disabilities. She was cooperative with this examiner and office staff.

**ACTIVITIES OF DAILY LIVING**
Reportedly, Kimberly resides with her mother "in the country." When asked what she enjoys she replied, "Nothing." She reported she can independently bathe and perform self-care activities and utilize 9-1-1 in emergencies. She stated that she does not cook or clean due to lack of motivation.

**SOCIAL FUNCITONING**
Kimberly stated she does not maintain intimate or social relationships.

**MENTAL STATUS**
Thought Process

> Her thought process appeared clear and goal directed.    There was no
> evidence of loose associations, flight of ideas, circumstantial, or tangential
> thinking.
>
> **Thought Content**
> Kimberly reported no overt signs of delusions, hallucinations, or the
> presence of a thought disorder.  She reported no current suicidal and/or
> homicidal ideation or intent.
>
> **Sensorium and Cognition**
> Kimberly was oriented to person, place, time and situation.  Her general
> fund of information and intelligence (informally assessed) appeared
> average. (Tr. 409-411).

Dr. Fee concluded Taylor's GAF to be 57.  (Tr. 415).  It was unclear "to what degree her

tiredness and periodic drowsiness impacted her test results, however, that can not be

ruled out." (Tr. 415).

On November 7, 2010, Dr. Chiles removed a dental abscess and five of Taylor's

teeth.   (Tr. 503).   Scott & White's admission paperwork indicated that Taylor's past

medical history included: "Bipolar Disorder, Fibromyalgia, and Tobacco use." (Tr. 489).

The patient is to be on bipolar medication, but she is not taking anything. She does not

remember the medication's name. Ms. Taylor's surgery went well and she was

discharged on November 8, 2010 with instructions to follow up with Dr. Chiles in one

week and her primary care physician within two to three weeks for a hospital follow up.

(Tr. 492). She was given prescriptions for Augmentin, Peridex, Vicodin, and Cleocin that

would cover treatment for ten days. *Id.* There is no evidence in the record that Ms. Taylor

followed up with either her oral surgeon or primary care physician.

After a thirteen-month break in treatment, Ms. Taylor returned to Dr. Flower's office

because she ran out of her medication on March 28, 2011. (Tr. 444). Dr. Flowers reported

Taylor was "doing alright." (Tr. 444). During this visit, he conducted a mental status exam in which he found Taylor to be oriented to person, place, and time, Taylor was neat and clean, Taylor's speech was normal, and her judgment was intact. Dr. Flowers instructed Taylor to continue taking her medication and refilled her prescriptions. (Tr. 443-444). This is the last time Ms. Taylor visited Dr. Flowers.

During her September 1, 2011, hearing Taylor testified that she had not been outside the state of Texas in the last four years and that her daily activities included lying in bed and freaking out because she is "scared to step outside." (Tr. 76, 770). Freaking out, to Taylor, means that she cannot breathe and wants to run. (Tr. 79). According to Taylor's mother, Taylor was in an alternative school because she could not get along with other kids. (Tr. 83). During the same hearing Taylor's mother testified that although Dr. Le assessed Taylor for fibromyalgia, her daughter did not receive treatment. (Tr. 88).

Taylor contends that the ALJ erred in his analysis of Taylor's bipolar disorder by not properly evaluating it as an impairment under Listing 12.04 (C) of the Social Security Disability Evaluation. If the impairment meets the requirements of a listed impairment, the evaluation process ends and Taylor is entitled to disability benefits. Listing 12.04 *Affective Disorders* is satisfied if the requirements in both A and B of the listing are met or when the requirements of C are met. 12.04 (C) of the listing requires:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Here, Taylor does not meet the criteria of Listing 12.04 (C).  Although Taylor has had two episodes of decompensation, the medical records indicate that her episodes were primarily the result of discontinuing use of her medication and/or cocaine abuse rather than her bi-polar disorder. (Tr. 385, 309). The medical records do not suggest that Taylor has a residual disease process. While Taylor lives in a highly supportive living arrangement with her mother, it is because Taylor lost her home to foreclosure and not because of her health.  On a daily basis, Taylor reported she is able to take care of pets and do chores. Upon the record, substantial evidence supports the ALJ's determination that Taylor does not meet any of the three elements required by listing 12.04 (C).

The record likewise does not support Taylor's argument that the ALJ erred in not evaluating her under Listing 12.05.  Listing 12.05 requires the following:

> Intellectual disability refers to significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
OR

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1.  Marked restriction of activities of daily living; or

    2.  Marked difficulties in maintaining social functioning; or

    3.  Marked difficulties in maintaining concentration, persistence, or pace;

    4.  Repeated episodes of decompensation, each of extended duration.

Here, Ms. Taylor does not fulfill the requirements of section A because she is able to take care of her personal needs and has the ability to follow directions.  Dr. Frank Fee noted in his psychological report that Ms. Taylor reported "she can independently bathe, perform self-care activities and utilize 9-1-1 in emergencies.  She stated that she does not cook or clean due to lack of motivation. (Tr. 410).  Dr. Michele Chappius reported in her Psychiatric Review Technique that Ms. Taylor is able to "shop for groceries and cook" in addition to "perform some household chores." (Tr. 387).

Ms. Taylor does not fulfill sub-paragraph B as she does not have the required IQ. Dr. Frank Fee's Psychological Report on 10/6/2010 showed an overall IQ of 69 with Ms. Taylor's performance IQ equal to 69 and her verbal IQ equal to 73. (Tr. 415).  Although Ms. Taylor does have the necessary overall IQ for sub-paragraph C by one point, she does not have a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Taylor also does not have a marked restriction on her daily activities because on a normal day she wakes up, takes care of her pets, and is able to do chores.  Likewise, she does not have marked difficulties in maintaining social function.

Substantial Evidence supports the ALJ's determination that Taylor did not meet listing 12.05. Here, substantial evidence supports the ALJ's finding that Taylor's bipolar disorder was a severe impairment at step two, but did not meet or equal a listed impairment.  In addition substantial evidence supports the ALJ's finding that Taylor retained the RFC for "less than the full range for medium work." (Tr. 17).

> The claimant, I decide, can perform the exertional demands of at least medium work, that is, she can lift and carry 50 lbs. occasionally 25 lbs. frequently, and can stand, can walk and can sit for 6 hors in the usual work day, all with normal breaks.  The claimant has few non-exertional limitations on her physical residual functional capacity: she can climb stairs (and ramps) but not ropes, ladders or scaffolds or run or be exposed to dangerous machinery, heights or uneven surfaces. The claimant has non-excertional limitations on her residual functional capacity, all arising from her mental impairments: she is able to understand simple instructions, and concentrate and perform simple tasks; she can get along with others, and can adapt to work-place changes, and to supervision, but in a limited public/employee contact setting. (Tr. 17).

The ALJ's RFC determination is consistent with the findings of Dr. Hall, Dr. Dolan, Dr. Chappius, and Dr. Fee, in addition to the treatment records of Dr. Lee and Dr. Flowers. The ALJ concluded that based on the totality of the evidence, Taylor could perform medium work with limitations and gave specific reasons in support of this determination. (Tr. 111). The factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered by the Court is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Ms. Taylor argues that the ALJ did not accurately assess the medical opinion of Dr. Flowers.  The Social

Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     The physician's length of treatment of the claimant,

(2)     The physician's frequency of examination,

(3)     The nature and extent of the treatment relationship,

(4)     The support of the physician's opinion afforded by the medical evidence of record,

(5)     The consistency of the opinion with the record as a whole, and

(6)     The specialization of the treating physician. *Newton*, 209 F.3d at 456.

The ALJ properly considered the length of treatment and frequency of Dr. Flowers' psychiatric treatment of Ms. Taylor. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981.) The ALJ noted that even though Dr. Flowers treated Ms. Taylor for "more or less a decade," for her bipolar disorder, there was a two-year hiatus from treatment from November 2007 to January of 2009. (Tr. 404). However, based on the claimant's amended onset date of disability of August 29, 2007, Dr. Flowers only treated the patient for her bi-polar disorder three times under routine appointments. The remaining medical notes refer to three visits in the hospital, and the date he completed a Mental Residual Functional Capacity Questionnaire, but there is no corresponding treatment note.

Taylor argues that Dr. Flowers' entire medical record be given greater weight due to the nature and extent of the treatment. With respect to the opinion and diagnoses of treating physicians and medical sources, the ALJ wrote:

> I consider Dr. Flowers' opinion that the claimant has almost entirely restricted functioning capacity not supported by the medical evidence, specifically including his own records treating the claimant. I start this analysis by noting Dr. Flowers' statement is dated January 26, 2009 (Exh. 10F-6) – but the claimant's extensive treatment by Dr. Flowers took place from February 2000 through November 2007 (Exhs. 2F and 3F). She had a *two-year* break in treatment by him from November 2007 through January 1, 2009 (Exh. 13F), just days before he wrote his medical statement. I also note the claimant's amended alleged onset of disability, August 29, 2007, effectively an admission by the claimant that she was not disabled before that date. Dr. Flowers saw the claimant only *3* times after her amended alleged onset of disability and the beginning of the 13-month break in treatment.
>
> Dr. Flowers' records show the claimant being admitted to Cypress Creek psychiatric service on August 11, 2007, complaining that she had become out of control (Exh. 2F-6 et al.); but the psychiatric evaluation by Dr. Flowers, shows the claimant had been taking her medication off and on, and with recent cocaine substance abuse (See Exh. 2F-7). So the claimant was non-compliant with her medications and using drugs. When compliant she was shown to have a GAF of 60. The file also shows the claimant being admitted to IntraCare North Hospital, again psychiatric, on September 24, 2007, again deteriorated but again admitting not taking her medications and again reporting continuing substance abuse (Exh. 1F-11, 12). The final reports of discharge summaries, of these hospital stays do not appear in the file, though there are summaries of the discharge plans (Exhs. 2F-5, 6 and 1F-3, 4).
>
> On October 2, 2007, Dr. Flowers' noted, at an outpatient visit from the claimant, that she was oriented and neat and clean, had normal speech, intact judgment and insight and clear thought, with an illegible description of her affect (Exh. 2F-2). On November 19, 2007, Dr. Flowers described the claimant on mental status examination to have been the same as the month before (Exh. 2F-3; he prescribed the same set of medications as before, Exh. 2F-2). On November 21, 2007 (by context), Dr. Flowers wrote that the claimant was *doing well* on her medications, with an entirely innocuous mental status examination, but he prescribed Adderall for her (Exh. 3F-2, 3). And then a break in treatment of over a year occurred, beginning after this last visit.

On January 26, 2009, Dr. Flowers writes of the claimant almost identically to his descriptions for late 2007 - with the claimant's mental status described as essentially *ordinary* (Exh. 13F-10).  On September 25, 2009 – another more than several months break in treatment – Dr. Flowers described the claimant as very much in difficult shape, but noted she was out of her medications (Exh. 13F-8, but he did not have her admitted for inpatient care).  Again, we have non-compliance with medications.  On October 26, 2009, Dr. Flowers' description of the claimant is essentially identical to his notes from October and November 2007 (Exh. 13F-7).  The record of the claimant's visit on January 17, 2010, shows the claimant in not such great condition, but is a truncated examination, left blank in many places (Exh. 13F-5).  On March 28, 2010, Dr. Flowers wrote of the claimant as returned to her earlier stable and innocuous self (Exh. 13F-3).

In April 2008, during the break in the claimant's treatment by Dr. Flowers, the claimant was admitted to the St. Joseph Medical Center, reporting she was hearing voices telling her to kill herself (Exh. 12F-10).  She was not in good shape- but she had not seen Dr. Flowers in recent months – and her lithium level was low (Exh. 12F-15).  A drug screen was positive for benzodiazepines (Exh. 12F-16), but she was prescribed the drug.  Her treatment in hospital was to restart her Haldol, which helped immensely.

I conclude that Dr. Flowers' opinion, as contained in his medical statement, is not supported by the medical evidence, specifically in that he has described the claimant at her worst, that is, when she has not taken her medications or has stopped one of them – and so has not allowed for the effects of her treatment – her treatment by him.  I am allowed to consider the effects of treatment, and conclude based on the contemporaneously generated records of treatment by Dr. Flowers, that the claimant, when she takes all her medications as directed and does not abuse illegal drugs, does quite well and is *not* as described by Dr. Flowers in his medical statement. (Tr. 18-20).

As to Taylor's contention that the ALJ erred in not giving deference to Dr. Flowers' opinion, the ALJ explained his rational for finding Dr. Flowers' opinion not persuasive due to inconsistencies between the totality of Dr. Flowers' treatment notes and, in particular, his January 26, 2009 Questionnaire The totality of Dr. Flowers' treating records shows that Taylor's condition was well controlled and his mental status exams were unchanged from office visit to office visit. The only exception has been

when Taylor went off her medications and consumed cocaine and alcohol. The Court concludes that the diagnosis and expert opinion factors also support the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook v. Heckler*, 750, F.2d 395 (5th Cir. 1985). The proper standard for evaluating pain is codified in the Social Security Disability Reform Act of 1984, 42 U.S.C. § 423 providing that allegations of pain do not by themselves constitute evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment that could reasonably be expected to cause the pain. The Act requires the Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166. Based on the following inconsistent statements, the ALJ rejected Taylor's testimony as not fully credible.

Here, Taylor testified about her health and its impact on her daily activities. According to Taylor, her mental problems began around sixteen years ago and progressively got worse. (Tr. 41). Taylor testified that she has been living with her mother for three years and relies on her mother for complete support. (Tr. 36-39). Taylor explained that her daily activities include letting her four dogs out, feeding them, watching T.V. all day, and occasionally doing laundry. (Tr. 50). According to Taylor, she cannot work because "the thought of going around strangers, strange people, just from

applying for a job much less going in and working [she just gets] panicky and start[s] panicking and just freak[s] out. (Tr. 54). However, Taylor admitted to leaving the state of Texas on two cruises to populated resort towns of Key West and Cozumel seven to five years ago. (Tr. 52-53). When asked if she was abusing drugs, Taylor answered in the negative and later testified that she had used it before her hospitalization in 2007 but that her cocaine use "was just a random thing, though and it just so happened to coincide." (Tr. 44).

Taylor testified that she only takes Ibuprofen for her reported "severe fibromyalgia" that [she does] not have the records for." (Tr. 72). However, the ALJ and attorney agreed that Ms. Taylor has never received treatment for fibromyalgia. (Tr. 46). Taylor's mother also testified that Taylor did not receive treatment, nor take prescribed pain medication for fibromyalgia.

Because of inconsistencies with the claimant's statements regarding her daily activities, fibromyalgia, and drug use, substantial evidence supports the ALJ's credibility determination. Further, nothing in the record suggests that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly this factor also supports the ALJ.

## D. Education, Work History and Age

The final element to be weighed is the claimant's educational background, work history, and present age. A claimant shall be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy.  42 U.S.C. § 423(d)(2)(A). Taylor was 44 years old at the date of the hearing (Tr. 36). She had completed her high school education, went to college for about a year and has not worked in over 15 years.  (Tr. 37-38).  However, she reported to Dr. Fee that she "had the following work history: fast food restaurant, ice house, gas station, waitressing, and day care center." (Tr. 410).

The record shows the ALJ questioned vocational experts ("VE"), Mr. King at Ms. Taylor's first hearing and Ms. Nielson at the second hearing.  "A vocational expert is called to testify because of his familiarity with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments, which the ALJ has recognized to be supported by the whole record.

During the second hearing on September 1, 2011, the ALJ posed the following hypothetical questions to the VE, Mr. King:

> Q.   Okay, we have a younger individual.   She's got a high school education, about one year of college, exertional ability to occasionally lift 50 pounds, 25 frequently, sit, stand, walk, inability six of eight, her push, pull and gross, fine is unlimited. *sic.* She can climb stairs but no ladders, ropes, scaffolds, or running. She can bend, stoop, crouch, crawl, balance, twist, and squat, limited exposure to heights, dangerous machinery, uneven surfaces. She has the ability to get along with others. She can understand simple instructions, concentrate and perform simple tasks, and respond and adapt to workplace changes in supervision in a limited public employee contact setting. Now based on those elements what kind of jobs could be done?

A.   That would be at the medium unskilled. Would you like a representative sample?

Q. Please.

A. A laundry worker, 361.687-018, medium unskilled, 28,000 in Texas, 408,000 nationwide. A hand packager, 920.587-018, medium unskilled an that doesn't have a production quota, it's, okay, 21,000 in Texas, 440,000 nationwide and we'll do a dishwasher, 381.687-010, medium unskilled, 10,000 in Texas, 460,000 nationwide and that's a representative sample taken from the Dictionary of Occupational Titles, the U.S. Department of Labor Statistics.

Q. Okay, hypothetical two, I'm going to reduce exertional level to 20 pounds and 10 pounds frequently with the same elements. Give me a sample of jobs that can be done at that level?
A. Yes, that would put her at the light, unskilled. It would be jobs such as an office cleaner, 323.687-014, 15,000 in Texas and 380,000 nationwide. A laundry worker, 363.685-026, light unskilled, 6,500 in Texas, 200,000 nationwide, and we'll just say a copy machine operator, 207.685-014, light, unskilled, 4,500 in Texas, 185,000 nationwide and that's a representative sample taken from the Dictionary of Occupational Titles the U.S. Department of Labor Bureau Statistics.

Q. ATTY: Now, lets take hypothetical number one and just basically keep everything the same except for just this one modification that she is unable to perform simple instructions, simple tasks or respond and adapt to supervision if it is provided verbally. Does that change your answer in any way?

A.   Yes, I think if she's not able to perform simple tasks that would eliminate competitive employment (Tr. 94-96).

The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Taylor was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.   Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the Court concludes that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts. *See Rivers v. Schweiker*, 685 F.2d 114 (5th Cir. 1982).  Because the ALJ's decision was supported by substantial evidence and comports with applicable law, it is therefore:

**ORDERED** that Defendant's Cross-Motion for Summary Judgment (Document No. 9) is **GRANTED**, Taylor's Motion for Summary Judgment (Document No. 8) is DENIED, and the decision of the Commissioner is **AFFIRMED**.

Signed at Houston, Texas this _____ day of _____, 2014

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE